[Civ. No. 23218. First Dist., Div. Two. Apr. 15, 1968.]

BERTHA TONINI, Individually and as Co-executor, etc., et al., Plaintiffs and Appellants, v. RACCOON STRAITS LAND COMPANY et al., Defendants and Respondents.

Edward Milton Tonini, in pro. per., M. L. Gunther, Tonini & Gunther and Michael Priest for Plaintiffs and Appellants.

Dinkelspiel & Dinkelspiel, John Walton Dinkelspiel, Erskine & Tulley, Allen M. Singer, and Graham, James & Rolph, George A. Brumder, Robert L. Harmon and John M. Collette for Defendants and Respondents.

AGEE, J.—This action was commenced on November 13, 1963 by Bertha Tonini and Edward Milton Tonini, her husband. He died on December 20, 1963, and his co-executors

(Bertha and their son, Edward, Jr.) were substituted in his place as a party plaintiff. The deceased is hereafter referred to as "Tonini."

The defendants who have appeared in the action are Robert Moor and Nella Moor, his wife, Tiburon Tidelands Co., a corporation (hereafter "TTC"), Norman Coliver, Orazio G. Rosolia, Raccoon Strait Land Company, a corporation (hereafter "Raccoon"), Robert L. Harmon, Robert D. Mackenzie and Donald F. Williams, individually and as co-partners in Moana Associates (hereafter "Moana").

On August 17, 1964 a summary judgment was rendered in favor of Rosolia and Raccoon (Code Civ. Proc., § 437c). On December 28, 1964 the action as against Moana was dismissed after plaintiffs failed to amend their pleadings within the 30-day period allowed by the court upon the sustaining of Moana's demurrer thereto (Code Civ. Proc., § 581, subd. 3). On January 11, 1965 a summary judgment was rendered in favor of Coliver (Code Civ. Proc., § 437c). Plaintiffs have appealed from each of these three judgments.

The action went to trial against the Moors and TTC on May 25, 1965. Four of the issues set forth in the pretrial order were severed by stipulation "for the purpose of entry of immediate Judgment." Judgment on these issues was rendered in favor of the Moors and TTC on June 11, 1965, after a trial lasting six days (referred to herein as "first Moor judgment").

The trial was resumed on June 21 and ended on June 30, 1965. Judgment on the remaining issues raised by plaintiffs' complaint and amendment thereto was rendered in favor of the Moors and TTC on November 22, 1965 (referred to herein as "second Moor judgment"). *Both* of these judgments are now *final.*

All respondents in the three consolidated appeals now before us have moved jointly to dismiss said appeals on the ground that, when the judgments in favor of the Moors and TTC became final, the pending appeals now before us became moot. The doctrine relied upon is sometimes referred to as "collateral estoppel by judgment."

*Summary of Plaintiffs' Allegations Against*
*Rosolia and Raccoon*

On March 27, 1958 Tonini entered into a lease-option agreement with Northwestern Pacific Railroad involving a tract of 1,200 front feet of tideland located at Tiburon, hereafter "Tiburon property."

The lease was for five years, with the right to extend such term for an additional five years if the payments called for thereunder had been met.

The lease gave Tonini an exclusive option to purchase the property by payment of $320,000 on or before September 27, 1963.

During the summer of 1961 Moor offered to buy the westerly 100 front feet of the tract for $200,000, but Tonini refused to sell all or any part of it to him.

About December 31, 1961 Rosolia attempted to purchase the same westerly 100 front feet. Unknown to Tonini, *Rosolia was acting for Moor.*

Tonini countered with a proposal that, if Rosolia would provide the financing for the $320,000 needed to exercise the option and the financing for the development of the entire tract, he would sell to Rosolia a one-half interest in the lease-option agreement for $150,000. Tonini further proposed that $100,000 of the $150,000 would be used for rent and taxes due under the lease-option agreement and for architectural and legal services needed to carry out the purposes of the proposed joint venture.

On January 20, 1962 Rosolia orally accepted and agreed to Tonini's proposal. Thereafter, several conferences were held with respect to finalizing the joint venture. Moor was present at these conferences, representing that he was there as an accountant assisting Rosolia.

In reliance upon the acceptance of his proposal by Rosolia, Tonini made no further attempts to take care of the rent and tax payments past due under the terms of the lease. The lessor-optionor was threatening a cancellation of the lease-option agreement and Moor and Rosolia were informed of this.

On February 18, 1962 Rosolia presented Tonini with a memorandum of agreement which did not correctly reflect the proposal orally accepted by Tonini on January 20, in that it substituted Raccoon, whose stock was owned in equal shares by Moor and Rosolia, in place of Rosolia, and as to the $150,000 to be put up by Rosolia, only $50,000 was to go to Tonini and the balance was to be treated as a loan of $100,000 by Raccoon to the joint venture.

Because he was threatened with a substantial financial loss if these new terms were not accepted, Tonini entered into the following agreement with Moor and Rosolia: a corporation (TTC) was to be formed to carry on the joint venture. Moor and Rosolia were to receive 51 percent (510 shares) and

Tonini was to receive 49 percent (490 shares) of the voting (common) stock in said corporation; however, Tonini was to retain 50 percent of the voting *rights*, to the end that he would have an equal voice in the management of the affairs of said corporation; Moor and Rosolia were to pay $50,000 to Tonini and $100,000 to TTC, in return for which Moor and Rosolia were to receive nonvoting, noncumulative, nonparticipating preferred stock in TTC. The agreement was executed in writing on February 19, 1962.

TTC was thereafter formed and its stock was issued in accordance with the above agreement. Tonini executed an assignment of the lease-option agreement to TTC on May 26, 1962.

Aside from the $50,000 which Tonini received from Moor and Rosolia, the major consideration relied upon by Tonini in entering into this agreement was the representation of Moor and Rosolia that they would pay off the option price of $320,000 and provide and/or obtain the financing of the development of the Tiburon property.

Moor never intended to perform the agreement. He intended to defraud Tonini out of an interest in the Tiburon property.

During the months following the February 1962 agreement, Rosolia advised Tonini that he had sold his one-half interest in Raccoon to Moor. Shortly thereafter all of Raccoon's stock in TTC was transferred to Moor and his wife. (Apparently, the stock interest of Moor and Rosolia in TTC was held in the name of Raccoon.)

Plaintiffs' allegations as to the events which occurred thereafter do not involve Rosolia or Raccoon. The final allegation as to this phase of the case is as follows: "That at all times herein mentioned, defendant Rosalia acted by, for, through and on behalf of defendant Robert Moor."

Thus plaintiffs' charges against Rosolia are in his capacity as Moor's agent or co-venturer. In either capacity, Rosolia is entitled to the defense of collateral estoppel by judgment.

*Plaintiffs' Allegations Against Coliver*

Coliver comes into the case, through the amendment to the complaint, as "50th Doe." There are nine references to him in the plaintiffs' charging allegations, the first of which makes this identification, "defendants Moor and Rosalia and Moor's attorney and associate, Norman Coliver, represented . . ."

Each of the other eight references in said allegations likewise joins Coliver with Moor and it is evident, under the authorities cited hereafter, that the relationship between Moor

and Coliver was such that the latter is entitled to the defense of collateral estoppel by the final judgments in favor of his client, Moor.

*Summary of Plaintiffs' Allegations Against Moana Associates*

In 1959, Andrew Lynch made a large loan of money to Tonini, who executed promissory notes secured by a deed of trust on the Princeton Inn in San Mateo County.

In July 1962, the balance and interest owing on such note was approximately $117,000, and Tonini and Lynch executed an agreement known as the Collateral Pledge Agreement, pledging Tonini's 490 shares of TTC as additional security in consideration of Lynch's agreement to forbear the collection of the notes and allow their discharge from the profits of Tonini's business or from the proceeds of conventional financing.

Moor and Coliver "conspired" to obtain control of the promissory notes and deed of trust on the Princeton Inn property together with the Collateral Pledge Agreement, for the purpose of foreclosing the notes and deed of trust and thereby forcing Tonini to liquidate his holdings in TTC. Moor and Coliver acted "in consort" with Robert Harmon, Robert D. Mackenzie, and Donald Williams, doing business individually and as copartners under the name of Moana Associates. These defendants conspired to purchase control of the promissory notes secured by the deed of trust, together with an assignment of the Collateral Pledge Agreement from Lynch (who had been disabled by a stroke since November 1962). Moana purchased and now purports to own the notes and deed of trust together with an assignment of the Collateral Pledge Agreement.

Thereafter Moor, Coliver and Moana attempted to foreclose on the Princeton Inn property and concurrently sought to purchase Tonini's interest in TTC for $100,000 with the intent of forcing Tonini to liquidate his interest in the Tiburon property and TTC in order to gain relief from the threatened foreclosure of the Princeton Inn property. Moana has pressed foreclosure proceedings against the Princeton Inn property since June 1963. Moana assigned the same to the Bank of Tokyo of California as security for a loan to enable Moana to purchase the same. In consideration of various payments, totaling $25,000, made by plaintiffs, Moana and the bank stipulated to various postponements of the foreclosure.

Robert Harmon and Robert D. Mackenzie (two of the three

persons doing business as Moana) acted as directors of TTC, claiming the right to do so by terms of the Collateral Pledge Agreement which provides that under certain conditions the pledgee of the 490 shares of TTC stock can vote that stock in the event of a default by Tonini on the Princeton Inn notes. No such right existed since no default or breach of conditions of the agreement occurred, and no consent or authorization was given by Tonini at any time.

In April 1964, Harmon (Moana) disclosed to Tonini that he and Mackenzie had been voting said stock since June 1963. Moana never reported the activities of the corporation to Tonini, nor did they report that from November 1963 to the date of the pleadings, during which period Moana was pursuing foreclosure proceedings, negotiations were pending for the sale of the lease-option for approximately $1,000,000. On the contrary, Harmon (Moana) together with Moor and Coliver repeatedly misrepresented that Tonini's TTC stock was only worth $100,000 in the presence of Tonini's attorney and Judge Byron Arnold. Such misrepresentations were made with an intent to mislead Tonini into thinking that his TTC stock had less value than it actually had and that Moana was being generous by offering Tonini enough to pay off the notes and deed of trust which Moana was attempting to foreclose.

Moana, Moor and Coliver concerted to manipulate TTC, and to represent themselves as duly elected and appointed directors of TTC, although they never had a quorum because Moana had no right under the Collateral Pledge Agreement to vote Tonini's 50 percent voting rights. Those defendants, without a legally constituted board of directors and without a legally constituted quorum, passed certain measures in derogation of Tonini's interests in his TTC stock and ownership of the lease-option.

A consideration of plaintiffs' allegations shows that there are three allegations of misconduct against Moana:

(1) Moana *conspired with Moor* and Coliver to obtain control of the promissory notes and deed of trust on the Princeton Inn property (together with the Collateral Pledge Agreement) in order to force Tonini to liquidate his holdings in TTC by pressing foreclosure proceedings against the Princeton Inn.

(2) Moana voted Tonini's stock illegally, and *concerted with Moor* and Coliver to manipulate TTC, acting without a legally constituted board of directors and without a legally constituted quorum.

(3) Moana, *acting with Moor* and Coliver, misrepresented the value of Tonini's TTC shares as only $100,000.

### Issues Determined By The Moor Judgments

Findings of fact were waived by all parties as to the issues severed and tried first in the trial of plaintiffs against the Moors and TTC. This (first) judgment decreed: (1) that the only interest of plaintiffs in TTC is as beneficial owners of a minority interest in the common stock of TTC; (2) none of the plaintiffs have any other interest in the Tiburon property by reason of the "Assignment of Interest under Lease and Option Agreement" executed by Tonini to TTC; (3) Moor did not at any time enter into a joint venture with Tonini nor agree to promote and to finance the development of the Tiburon property.

Findings of fact were made following the resumption of the trial as to the issues not determined by the first Moor judgment. There is an overlapping to some extent.

The second Moor judgment decreed: (1) that on May 26, 1962 Tonini sold and assigned the lease-option agreement of March 27, 1958 to TTC and that there was no fraud or misrepresentation by any of the defendants and no failure of consideration for such assignment and no cause for rescission of said assignment; (2) that none of the defendants committed any fraud or deceit or made any misrepresentations to Tonini; (3) that the purchase by Moana from Lynch of the promissory notes and deed of trust on the Princeton Inn was a bona fide business transaction and Moor never conspired with anyone to cause any improper transfer of said notes and deed of trust; (4) that no mismanagement or manipulation of TTC occurred and none of the defendants conspired to mismanage or manipulate TTC; all elections of directors were regularly conducted in accordance with law and amendments of the corporate by-laws were adopted in accord with law by a legally constituted board of directors and a legally constituted quorum.

These two judgments and the findings in support thereof determined that *none* of the charges of fraud and misrepresentation alleged by plaintiffs in their complaint and amendment thereto are true.

Such broad findings were necessary to the judgments, since the Moors were charged not only with direct liability but also with derivative liability, based upon the alleged fraud and misrepresentations of their codefendants.

The complete exoneration of the Moors and TTC likewise

extends to the remaining defendants, since they, *as plaintiffs allege,* were at all times acting for and on behalf of or with the Moors in connection with the subject transaction.

In *Fairchild* v. *Bank of America* (1958) 165 Cal.App.2d 477 [332 P.2d 101], defendant bank (special administrator) filed its first and final account, to which plaintiff executor objected. The account was approved. The same plaintiff subsequently brought an action against the bank's assistant trust officer for recovery of losses from alleged failure to protect and account for assets of the estate. This action was dismissed by the trial court on the plea of res judicata, even though the trust officer had not been a party in the prior proceeding.

The appellate court stated: ''In the case at bar, the findings of fact made by the probate court to the effect that all property was accounted for and that all allegations contained in petitioner's [bank's] first and final account are true, is in effect a finding that the defendant bank and all of its agents and employees have acted properly with respect to the administration of this estate. . . . Had the probate court merely found that the defendant bank had not itself been guilty of any misconduct or negligence, then it would be arguable that some of its agents might nevertheless be responsible for unaccounted for assets or other asserted irregularities, but the probate court found that the special administrator has accounted for all assets received by it and for all income and disbursements. In effect, it was found that the estate had been properly administered. This being true, plus the fact that the plaintiff does not suggest that the defendant Brchan [trust officer] has incurred any liability other than or different from that sought to be imposed upon the bank, the plea of res judicata is available to him. . . . '' (165 Cal.App.2d at pp. 483-484.)

*Fairchild* relies upon *Bernhard* v. *Bank of America,* 19 Cal.2d 807 [122 P.2d 892]. There the executor of a decedent's estate had filed an account at the insistence of the probate court, accompanied by his resignation. Helen Bernhard, a legatee, and others filed objections to the account. One item in dispute was a bank account of $4,155.68.

After a hearing on the objections, the court made an order settling the account which included the finding that the decedent had made a *gift* to her executor of the amount of the deposit in question. Thereafter, Helen Bernhard was appointed administratrix with the will annexed.

In this capacity, she sued the depository bank for permitting the withdrawal of the money by the former executor. It

was held that the bank could raise the plea of res judicata against the administratrix even though it was not in privity with the former executor nor was it a participant in the proceeding in which it was determined that the money was a gift.

The criterion for the application of res judicata *against* parties in the position of plaintiffs herein was stated by the Supreme Court as follows: ''Was the issue decided in the prior adjudication identical with the one presented in the action in question? Was there a final judgment on the merits? Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?''

In the instant case the answer to each of these questions is in the affirmative. The absolution of the Moors and TTC from any of the fraud or misrepresentation charged by plaintiffs necessarily absolves the defendants now before us. Likewise, all of the improper conduct alleged against Moana was alleged to have occurred in concert with Moor. As in the *Bernhard* case, the court in the prior second Moor action not only absolved Moor from personal liability but determined that no such improper conduct occurred. Therefore, those identical issues having been already necessarily resolved by the prior judgment, Moana as well as the other defendants are entitled to the defense of collateral estoppel by judgment. In addition to *Fairchild* and *Bernhard,* see: *Zeppi* v. *Beach* (1964) 229 Cal.App.2d 152 [40 Cal.Rptr. 183]; *Grable* v. *Grable* (1960) 180 Cal.App.2d 353, 360-361 [4 Cal.Rptr. 353]; *Garcia* v. *Garcia* (1957) 148 Cal.App.2d 147 [306 P.2d 80]; *C. H. Duell, Inc.* v. *Metro-Goldwyn-Mayer Corp.* (1932) 128 Cal. App. 376 [17 P.2d 781].

The appeals are dismissed.

Shoemaker, P. J., and Taylor, J., concurred.